Mr. Stark and Mr. Dunn have returned to their rooms. Thank you for the cooperation on changing the sequence. Good afternoon. Good afternoon. I'd like to begin by thanking the Court for accommodating our scheduled request. Very well. I hope everything got resolved. Mr. Stark, as I have in memory of the briefs after reading them several times, the jurisdiction issues have only addressed by you in the red brief and even then only in a fairly limited portion. As I recall, not addressed at all in the red brief. Was there no call for supplemental briefing to address jurisdiction once this case was identified to be listed as a related case and heard by the same panel as the air measurement? I believe, Your Honor, it happened sort of backwards from that, sequentially. Our case came up and it was noted upon filing here. The parties below and the judge, I can gladly assume jurisdictions, was present and did not question it. When it came to the court hearing's first file, there was a notice to show cause why it shouldn't be transferred to the Fifth Circuit. That's how it first came about. There was some briefing on that. We pointed out that we believed that a transfer was appropriate and we were told then to address it in our briefs-in-chief. After that time, we were unaware of the income case. After that time, a suggestion was made by the parties in the other case that perhaps these had some connection and the decision to place them together came from that. But you were instructed to address jurisdiction in your briefs by the motions panel? Yes, Your Honor. And why didn't the blue brief address jurisdiction? I did find this in the gray brief, but only a rather small, short, simple portion. And I didn't find it in the blue brief at all. I couldn't understand why. I thought that was the primary issue in the case. And you're the moving party and you're the only brief, and where is there a word about jurisdiction? Your Honor, I'm not sure of this. I believe it to be a matter of timing as when the first brief was issued. There was a stay in the briefing. We had actually started briefing. There was a stay to address this issue. Then we were told we could go ahead and address this in briefs-in-chief, and the briefing was resumed 40 days before response for the red brief to come. I believe our blue brief was already extant at that time. And so we addressed it in the gray brief. Well, let me ask just one final question. I don't want to take up any more of your time with this procedural history, but are you content that in your gray brief portion that is addressed to federal jurisdiction that you've said everything that you, as the appellant, want and need to say on the subject? I believe we had added an opportunity in the briefing, Your Honor. I approve it. Then proceed. Thank you. We're actually here today because of on the merits of error decisions which are strange in their combination. We were told on a motion for statute of limitations that we had sued too late. We were told on a motion for damages that we had sued too early. We didn't have damages yet. And so the conundrum for us is to figure out where we should be and what should have happened in this case. With respect to the statute of limitations, it's our belief that the judge erred clearly as a matter of law by imputing knowledge to the client without any analysis of duty whatsoever. The person that was at the level of this is an attorney named Thomas Hildreth Baker Boggs. And he was assigned the duty of building a portfolio of other patents around the one in question in this case. On the basis of his assignment there, he did that work. Well, what are you asking for, a trial? Yes, Your Honor. So you're saying there were trial issues and therefore summary judgment was not the right mechanism. That's correct, Your Honor. Now, to succeed in that, you have to overcome the – I guess it was an affidavit, perhaps a deposition, I don't recall – patent prosecution expert who said that whenever one sees, at least in a method claim, a transition phrase consisting of, that sets off bells and lights and sirens as a no-no except in perhaps very unusual extreme circumstances. Your position seems to be, well, Felder was hired to look at something else. But that deposition or affidavit suggests that whatever one was hired to do, if it included reading the patent, red lights and sirens should have gone off the minute the transition phrase was plotted. Then you look in the prosecution history and say, well, why the hell did she put that in there? What was she trying to overcome that could only be overcome by such a severely limiting transition phrase? And therefore you, in this case obviously Mr. Felder, could have discovered all of the foundational facts that would support the non-practice claim. But you say, no, not so. Well, there was testimony in that vein from Richard Pearson. There was also testimony in his affidavit which clarifies and explains that that's actually not the conclusion he was attempting to state. It was taken out of context as he places it. But more importantly, Your Honor, the court below never specified exactly what duties Mr. Felder had which would have imposed a basis for impugning the knowledge to the client here. We're assuming that Mr. Felder on his own would have gone digging on that basis. He was not charged for doing so. He was never instructed to do so. It wasn't his duty to do so under the instructions he was given from the client. And absent a scope of employment which would require him to inquire and to come up with that conclusion and to report the duty to his client. We assert there's no basis for impugning it. The judge below actually did no duty analysis whatsoever. In terms of scope of employment, he made two comments. One of them was that it doesn't matter. He said, we have two orders, one from the sermon judgment and one on the oath of denial motion. One, he said, it makes no matter. And the other, he says, regardless of what the scope of the duty was, regardless of the possible limited scope of Felder's duties, he does the imputation of knowledge. And in the other order, he says, accordingly, no matter how the terms of Felder's assignment were couched, his mere review was sufficient to trigger the limitations period. So the fact that Mr. Felder merely looked at the document was enough for this district court to assume that it was a duty to investigate this and to report to the client that there's a scope issue with respect to the substitution of the word consisting where comprising may have been used instead and had been used as originally thought. Isn't there another no matter? And that is that the damages asserted were too speculative. You didn't have a product. You weren't approved by the FDA. I'm not sure you had controlled clinical tests. It's a long way from where you were to what you allege you would have had. That is the other primary issue, Your Honor. And as it stands, it's been mischaracterized by the court below. Because there are excellent products. There are filters. There are hundreds of them. And they have been used. And they have been tested. They have been tested on humans. They have been tested on human blood. Wait, wait, wait. Your product? Your product? Yes, sir. Yes, sir. They have been tested on human blood. They have been tested in humans. In humans. The declaration that Dr. Palomo attaches many references to, Your Honor, which were disregarded entirely by the district court, which established what was going on with humans. They found that they had a therapeutic effect. They reduced the need for a blood pressure supporting mechanism. That it increased cell function. What about safety? Safety was also tested as well, Your Honor. Safety and efficacy were also tested. In humans. In humans. What is it? Filtration and then return of the filtered blood. What is lacking, Your Honor, is one randomized large-scale clinical trial which could statistically measure survival benefit. That's the big difference. That's the final step for FDA. And that's what the FDA has to decide, not the court. That's correct. The FDA didn't decide that. But we have evidence. What are the percentage of drugs that take that last step as opposed to those that start that last step? To begin with, Your Honor, this is a device, not a drug. And we do not have a record statistically, a basis in the record statistically to cope with that particular question to say what it is. But we do have evidence from FDA experts who say if the product works, it will pass that review. And we have, at the same time, substantial evidence, particularly in Dr. Palomo's evidence, which cites many, many peer-reviewed studies which make it look very, very likely that this does work, is safe, and will provide the survival benefit. The question then becomes what's the standard? Do we have to show it absolutely? Or is it only necessary for us to show a reasonable probability of success? We believe the latter is the case. You perhaps listened to the argument we had before, and there were several references to your case. And they said, well, we're different from you because you didn't have a trial and they did. Is that a distinction with a difference? You mean a trial? You haven't had any trial. Any? Infringement trial you mean, Your Honor? What's that? Are you referring to an infringement trial? Yes, a patent trial on a patent issue. That's right. Remember in the case we just heard, there had been markman proceedings. There had been a considerable amount of patent activity. That's correct. None here. Is that a distinction that makes a difference with regard to jurisdiction? We still have a need for resolving patent law issues here, Your Honor, that must be tried. Although it's not against an accused infringer. In this case, to establish that the standard of care was not met by the prosecuting attorney, we have to consider was the amendment that took out the word comprise and put in consistent necessary when faced with the rejections, when faced with the prior art that was there? Is that on record, by the way? I believe so, yes, Your Honor. We couldn't find it. What rejection was at stake that required the amendment? And where is it in the record so that if it's such a big patent issue, you would have provided it to us? The issue, Your Honor, is the presence of the word consistent versus comprise. The details of it was the rejection that called for that narrowing. The details of the rejection I do not believe were addressed in the petition. Why not? It seemed to not be. If you want to convince us that this is a big patent issue that we need to delve into, why wouldn't you have presented that issue to us? Well, under the well-planned complaint rule, Your Honor, what we did was we complained under 1338A saying that it was inadequately drafted to not provide the scope that we were entitled to, and that this caused the harm. Is it your view that whether it was a responsible citation of prior art submitted voluntarily, it amounted to the same thing, narrowing the claim? Your Honor, the issue here is was this a gratuitous amendment or was it actually required? Am I answering your question, sir? You're saying there is a difference. There is a difference between an amendment which is required by the prior art and an amendment which is not. This one was definitely not required by the prior art. How do we know that? You say so, but how do we have any clue whether it was or wasn't? Well, that's the subject for proof at trial, Your Honor. That's what we have to prove. That's what's up. That's our burden on the merits once we're back in court at the trial level to show that there was a breach of the standard of care. What we've alleged is that the insertion of the word… It seems to me that if you wanted to convince us that we have a patent law issue of mistake, you might have wanted to show us that there was a credible issue of patent law mistake. We believe, Your Honor, that the presence of consisting or comprising had been, under the circumstances alleged, and assuming… Well, that was… Might have been the most logical thing to do and the only thing that could have been done to save what little was left of the patent under the circumstances. Well, that is exactly the patent law issue which is necessary for resolution, Your Honor, that we have to resolve in the court world. If it's there at all and you haven't shown us that the issue is there at all, you have alleged that it's there. I see nothing in the record that shows me that there's an actual issue except your allegation. Well, based on the complaint, Your Honor, the complaint puts that at issue. The complaint says that it was too narrowly drafted and we believe that to be sufficient under 1338 and under the liberal standard of… Then, under your theories, we really are in a situation where every single patent malpractice case belongs in federal court. There is no such thing as a state law malpractice claim when it involves a patent attorney. Is that what you're saying? Your Honor, I would not go so broadly. I'm not in a position to state that. This case in particular, I can tell you, has substantial patent law issues. In order to resolve two things, one is whether the standard of appeal is breached and the other is what are the consequent damages, what scope damage was done and what financial impact does that have. Then, the same question we asked before, what case wouldn't raise that? How would you avoid that issue if patent malpractice is at stake? I'm not in a position to craft a rule for this court, Your Honor. All I know is that the well-pleaded complaint rule and the case law of 1338 sets out that if there is an issue, this is the court where it belongs. My fear is the alternative to what has been discussed here, Your Honor, and that's that we have Markman hearings and we have all sorts of things going on in the state courts getting anything but uniform decisions rather than the federal court where these issues belong. Well, it's not that simple because the Supreme Court has not said that the issues belong in federal court because of patent issues. It's actually said the opposite, that depending on the context, those issues, even though they're pure and difficult patent issues, belong in state courts. Well, Your Honor, this is not a county court. These are the typical contract cases. I get a patent, and Judge Rader has a manufacturing company. I think he's infringing my patent. We negotiate. He takes a license. Later, he varies his product. He says, well, now I'm not going to pay the royalties anymore, Michelle, because our license agreement only covers your patent, and I'm doing something that's not covered by your patent anymore. So I file a breach of contract action in the state court against the other party to the contract, and we've held that that's a state issue. That's speed code in other cases. And yet, it turns entirely on is there infringement or not. And it clearly goes to the state court. The only issue in the case of any importance is infringement or no infringement decided by a state judge and jury. Well, Your Honor, I'm well into my rebuttal time. I'm about to expire on this. My preference would be that I discuss the merits and reserve some time for rebuttal, if the court will permit that. Good. Well, we'll give you a little bit of rebuttal time back, too, so you're not prejudiced. Thank you, Mr. Stark. We'll hear from Mr. Gunn. Thank you. Good afternoon. I'm David Gunn, representing Fulbright v. Morski. And to start with jurisdiction, I agree entirely with the remarks that my friend, Mr. Stark, has made. We do look to the complaint. That's the end all and be all. It may have consequences that, in some cases, end up in the federal system. And that is one of the sharp edges of the well-pleaded complaint rule. The consequences work both ways, as the court knows. It doesn't bring in counterclaims and so on. Would you argue the jurisdiction issue in your brief at all that I saw? Yes, Your Honor. It's pages 10, 11, 12, 13, and 14 of the red brief. And the timing explanation you just heard is the reason it didn't come up in the blue brief. The briefing was already underway when the court asked, please address it. So the only briefs left to address it in were the red brief and the reply brief. And we do agree. I don't know if the court has seen the AIPLA quarterly journal article from last fall that proposes one broad solution. It's the Sean Seymour article from the fall of 2006 entitled The Competency of State Courts to Adjudicate Patent-Based Malpractice Claims. That's page 443 of volume 34 last fall. It's a long synthesis of Grebel, Christensen, Merrill Dow, and a lot of other cases the court's familiar with that may help give the court some comfort that at least under one writer's analysis, not all cases imaginable will end up in federal court. I'd urge the court to go case by case. I guess the issue for us is not whether it's all cases versus something less than all. It's just whether it's going to be a hell of a lot. That's a fair concern, Your Honor. But 1338, let's remember, says exclusive and puts patent-related questions exclusively in federal court, which is not true in 1331 cases like Grebel. The balancing that we've heard about today in your other case of federal-state balancing, Congress has done the balancing in 1338. There seems to be a fact here that you patent attorneys like to be in federal courts. That's where you've always been. You know the judges there. You want to all stay in federal courts as evidenced by the kind of reluctance to raise that issue at any point. At what point do we have to intervene and say, no, we belong in state court? I would start with your opinion, Your Honor, in additive controls, if I have my history correct, and say let's not let parties stray from the well-pleaded complaint rule. And you're quite right. If the only patent issue comes up in a counterclaim, then that doesn't count. I say let's just stick with the line that we have had certainly for tort cases for a long time, additive controls, Hunter Douglas, and so on. As long as I – all you've just told me is that every one of these is going to end up in federal court in the future, because it's easy for me to write a patent law complaint into any patent malpractice case, isn't it? Well, it's easy to write in a world without Rule 11 where you have no constraints on what you can allege, but if you have a well-founded – Well, if there's an alleged mistake of patent law, I'm not going to have any trouble stating a patent law question, am I? I think that is correct. So all of these are in federal court from here on out. Is that what you're suggesting? Well, I'm not certain about all of them. I think a large number of them are in federal court. Okay. Let's – there's always the exception. If you're putting the exception on, the exception is going to be in state court rather than the exception being in federal court. I qualified yes to that. I have misgivings about the diminished settlement value theory that I heard a few minutes ago in the previous case. I'm not sure – They had qualms about your case, too. It's good of you to – Everybody was all together. They put the ball. Judge Rader, you asked about a part of the file history, if I understood your question. Yeah. I was wondering why the – why did they narrow it? What was in the record? Well, part of that is in the record at page 548. I don't think there is a complete answer to that, the reason being the federal appellate system's rules for greeting an appendix. We, frankly, did not anticipate a dispute about federal jurisdiction. We tried to keep the record trim and designated what was going to go into it based on the issues that were before us. Again, one of the side effects of the well-pleaded complaint rule, an affirmative defense statute of limitations happens to be an issue, the lead issue on appeal, and that's part of the answer. It was not an effort to conceal the file history. It might have been helpful to have more to be able to make my affirmative defense. Can you state in a sentence, just as background information, what the rejection was that led to the substitution of consisting of in place of comprising? I believe part of it was a business need on behalf of the client to get a patent issued as quickly as possible. There were rejections based on prior art called Mosaic under Section 102, and there, I think, was a 103 rejection based on a prior art that I can't recall. Whether that justifies consisting of, I don't know, but that's what I saw. But the objections were essentially prior art type rejections, not indefiniteness or anything like that. As far as I recall, that's correct, Your Honor. And I wish I had a better answer. It just hasn't been a focus of our dispute. You know we focused on limitations and damages. I'm relatively contented with the state of the briefing by both parties. I would highlight for the court just a couple of points. Number one, on limitations, our best case, in my judgment, is the Burke case on imputation. We don't have a fight about how statute of limitations works. We have a fight about the imputation rule. And I would call to the court's attention our Burke case, which the district court relied on in its Rule 59 ruling, which is nowhere sighted than any of the other sides of the briefing. And I think that silence is telling. The second point I would have for the court. Well, what does it remind me about Burke? Burke is a case of essentially evidence destruction. It wasn't. You had a person who was smashed up in a car wreck. And I wanted to sue the car maker for question, for making a loud car. This is a case you cite once in your brief.  Oh, by no means, Your Honor. It is perhaps as close as any as summing up the problem. And the district court relied on it. I just want to use it to establish a rule of imputation. The attorney's knowledge is imputed to the client. We have a great and mighty clash about that. And in our view, there's a century of Texas law that supports strong imputation. The exception relied on by the plaintiffs under Section 275 of the Old Restatement of Agency is not the law in Texas. It has never been adopted. And I just pulled off your library shelf the new restatement that came out last year, which is even stronger in its rule of imputation. 275 is no longer accepted by the ALI. That duty to disclose discussion in the old restatement from four years ago is not the position of the ALI today. It has never been the position in Texas. And the parties have briefed it. I trust the court to get that issue right. But I just want to make it clear, we are very strongly opposed to the plaintiff's position on imputation. Burke is simply an emblematic case. Unless the court has other questions on limitations, I will move on and leave that to the briefing. The remaining issue on merits is the speculative damage rule. And I think the briefing covers that as well. You heard an argument made that there are facts to be found in the declaration of Dr. Belomo. We will just have to disagree about that and ask the court to read Dr. Belomo's declaration. Were there tests showing that the device was effective? In our view, absolutely not, Your Honor. If I might read a portion of the record on that. We asked Plaintiff Matson, the inventor, about that on page 1056 of the record. And summed it up in one question in his deposition. So it's fair to say that no one in the world has ever shown there's a survival advantage for sepsis for the 100 kilodalton to 150 kilodalton filter range in humans. Answer, that's correct. That is the end of it. Dr. Belomo's evidence raises the level of abstraction and says, well, filtration in the abstract has been tried in animals, in people. A lot of this evidence is about animals. But the undisputed fact remains, there is still no showing of any advantage in humans. We have yet to do the clinical testing. That's why Dr. Belomo says, I think the technology shows promise. Was there actually some evidence that the Immunoset filter worked worse than the traditional filter? There is some evidence of that, Your Honor. It's contested how convincing that study is. But yes, the evidence is that the mortality rate went from 60 to 79 percent in a few people. Not a huge, randomized clinical trial. But it is some suggestion that you can't, as we all know, extrapolate animals to humans. You can't make that last step. Well, the animal to human point is clear enough. But I understood Mr. Stark to be asserting that there were tests both on human blood in the lab and tests on human patients where after the filtration, the blood was returned to the body of the patient. Do you agree on that? I don't understand the record to represent this device being used in humans that way. Certainly not that it led to any survival advantage. He didn't say anything about survival advantage. What he said, as I recall, was there were uses on a sepsis patient of the claimed filtration method, using that large pore filtration, which showed certain biophysical benefits when lab tested and which showed clinically discernible advantages on the human patient. Not survivability, but other advantages. That's what I understood him to say. You don't know of any such evidence? I don't believe so, Your Honor. And when I was preparing for argument, I read the claims briefing fairly carefully and looked for pinpoint citations to take me to that. Perhaps we'll hear about those citations on the bill, but I don't recall any such evidence. The court has no further questions. I return the balance of my talk to you. All right, thank you, Mr. Dorn. Mr. Rosenkranz. Pardon me, Mr. Stark. Four minutes. Mr. Stark, was it comprising in the original claim? No, it was not. Excuse me. Comprising was, Your Honor, there was a rejection under, if I remember correctly, a reference referred to as Mosaic, which did not require the amendment was made. It was unconnected to it. We think the amendment was gratuitous at the time it was submitted. That's the issue that comes up. There were plenty of other discussions. Comprising was in the claim? Comprising was in the claim as filed. The original one? In the original filed complaint. Excuse me, the original filed claim. The rejection was received on the art for a reference named Mosaic. The record? Where in the record? I cannot factor that in the record for you. I'm sorry, Your Honor, we didn't address this. I have confirmed our initial brief was submitted before the jurisdictional issue came up. The briefing was stayed while that was pending, and we were told by the clerk we should address this in our brief. So that's why you have the thin record you've confirmed. Is there anything in the record, by the way, to show the point that you made about the use of your device on humans? Yes, Your Honor. In the declaration of Dr. Belomo, I can quote you from paragraph 19. I believe I have the right page size for this. It's Joint Appendix 737. 737. I believe is where that starts. I have the actual copy of this, but I do not have the Joint Appendix number, and I apologize for that. But there is a paragraph 19 in Dr. Belomo's declaration, which says, LPHF technology, that's large pore human filtration, has also been tested numerous times, both on the bench, using whole human blood, and on human beings. These peer-reviewed studies have uniformly shown that LPHF clears septic cytokines from the blood more effectively than has been shown with any other blood purification device. Moreover, the larger the pore size, the more effective the cytokine clearance and removal. These studies also found that in human patients with severe sepsis, treatment with LPHF technology led to a significant improvement in white cell function and improved physiological benefits. No survival data, though? There is no statistical survival data in this, Your Honor. Well, I don't think it's what it's all about. It's not the goal of these particular studies to establish the statistics for that, Your Honor. And that's what Dr. Matson was referring to when he said that the study had not established that. That's what the final clinical study would do, Your Honor. That's what we would have if we had the chance to go forward and go get the funding, which Johnson & Johnson was prepared to provide, but would not once they discovered the weaknesses in this pathway. We can't help any of that. All we can decide is whether it could safely be predicted that the FDA would definitely find sufficient efficacy and sufficient safety when such a large-scale, randomized test of survivability was done. And so you have to be saying, well, just from what Dr. Gallomo just said, as you read it, a court could confidently conclude that the safety efficacy test at FDA would pass muster. It looks to me like it's awfully speculative. All we need to establish, Your Honor, under Texas law is that we have a good chance. That's actually the standard that the court below stated but didn't use properly. There's other Texas case law that says it need merely be probable. What's happened is the court below… No, but the problem is you have a chain of inferences here. One link in the chain is that the FDA would allow the product and method to be used. And that would depend on a survivability test that hasn't been attempted yet. If that test were done, Your Honor, we would have no probability to talk about it at all. There would be no speculation. We would have absolute certainty. And the law in this case does not require absolute certainty. It requires a good chance, as stated by the court below, or probable, as stated by the Texas court. But how do we have any way to assess the chances of the survivability test just based on paragraph 19 of Gallomo? Paragraph 19 is what I quoted you, Your Honor. What Dr. Gallomo does is he cites scores of references. These are peer-reviewed studies. There is a wealth of scientific evidence where this has been tested to see efficacy, tested to filtrate on other cells to see what it does to them when they remove it, to confirm that it's actually the thing that's creating the septic reaction. There's a wealth of scientific knowledge here, Your Honor, which got the back of the hand in the court below. He completely disregarded it, declared the entire wealth of scientific knowledge as mere speculation, and wouldn't cope with it. We think we have the right to actually have this tested, Your Honor, to see if this link can be made. We think that probable is established by our scientific background. And we think that it's incumbent upon the court below to draw all inferences in our favor on that question, since this is on summary judgment. No jury, no judge got to see all of this and make a factual determination on the likelihood on the basis of the wealth of scientific evidence that Dr. Gallomo cites as well as summarizes. But the patent really only covers a narrow range, not all. LPHF does it, technology. Well, there are clean interpretation issues to be done, which is part of our... No, back into our jurisdiction issue. Judge Rader's point, I suppose, is if the test to which Dr. Gallomo was referring were at the range of 500 kilodaltons, it would have no relevance at all to this case because this patent has a very narrow, clean range. Jonathan Johnson backed out for a large number of reasons, as your brief itself tends to say, beyond just what's at issue in this case. Your Honor, we have evidence from Johnson & Johnson that the technology did not scare them away, that their basis for backing off was pure gothic intellectual property, and we've cited that. I won't repeat it here. We think that any inferences with respect to that need to be drawn in our favor, since we are the non-moving party in this case, and that this probability should be weighed by finder of fact, not dismissed without any discussion of the technology, without any discussion of all these references that Dr. Gallomo has provided, without even any mention of whether it would fall within the claims or not, because that record wasn't developed. We never got the chance. We never got our dating court to do that. All right. I think we have the positions of both sides. Thank you, Your Honor. Thank you, and we'll take the case under review.